## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Robert E. Blackburn

Civil Case No.  05-cv-00162-REB-MJW

AMICA MUTUAL INSURANCE COMPANY, a Rhode Island corporation,

      Plaintiff,

v.

BARBARA FARHAR,

      Defendant.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS

---

**Blackburn, J.**

On February 8, 2006, this matter came before me for trial to the court on plaintiff

Amica Mutual Insurance Company's single claim for declaratory relief included in its

**Complaint** [#1], filed January 31, 2005, and identified in the **Final Pretrial Order Re:**

**Claims For Declaratory Judgment** [#69], filed January 31, 2006.[1]

I have judicially noticed all relevant adjudicative facts in the file and record of this

action, received the stipulations of the parties and the evidence educed at trial, and

considered the arguments advanced and the authorities cited by the parties during pretrial

---

[1] Although my Order Concerning Motion to Bifurcate and Modification of Scheduling Order [#26], filed October 4, 2006, addressed both Amica's claim for declaratory judgment and Farhar's competing counterclaim for declaratory judgment, the Final Pretrial Order appears to have addressed only Amica's claim.  (**Final Pretrial Order Re: Claims for Declaratory Judgment** at 1-3, §§ 3.A & 3.B [#69], filed January 31, 2006.)  Because the Final Pretrial Order is the controlling document, this Order will address only Amica's claim.  Nevertheless, the resolution of Amica's declaratory judgment claim necessarily disposes of defendant's declaratory judgment counterclaim.

and trial proceedings.  I now enter the following findings of fact,[2] conclusions of law, and

orders.

## I.  FINDINGS OF FACT

1.  I have jurisdiction over the parties to this action pursuant to 28 U.S.C. § 1332

(diversity of citizenship).

2.  Venue is proper in the District Court for the District of Colorado.

3.  The parties are plaintiff Amica Mutual Insurance Company ("Amica"), a Rhode

Island corporation, and defendant Barbara Farhar ("Farhar"), a Colorado resident.

4.  In assessing the credibility of each witness who testified at trial, I have

considered all facts and circumstances shown by the evidence that affect the credibility of

the witness, including the following factors: the witness's means of knowledge, ability to

observe, and strength of memory; the manner in which the witness might be affected by

the outcome of the litigation; the relationship the witness has to either side in the case;

and the extent to which the witness is either supported or contradicted by other witnesses

or evidence presented at trial.

5.  The central issue in this case is whether the subject contract of automobile

insurance reflects an intent to provide Farhar with unlimited extended personal injury

protection ("PIP") benefits associated with a car accident in which she was involved on

April 12, 2000, or alternatively, whether the failure to include a dollar figure on the

endorsement page of the policy was merely a scrivener's error, making it appropriate to

---

[2] My findings of fact are based on a preponderance of the evidence.

reform the policy to show that both parties intended the policy to include a cap on extended PIP benefits of $200,000.

6.  In April, 1996, Farhar contacted Amica about purchasing automobile and home insurance.  She spoke to Wendy Hawley, an underwriting representative with Amica.

7.  Hawley took information from Farhar relevant to an application for automobile insurance.  Although she does not remember the phone call specifically, Hawley testified that the questions she asks of all new applicants are dictated by the various screen prompts that she must complete in order to complete the insurance application.

8.  Among the items Hawley routinely covered during the application process were a discussion of the two types of PIP insurance Amica offered:  basic PIP, which covered medical expenses and work loss up to $50,000; and extended PIP, which expanded that coverage to $200,000.  Hawley has never seen any information from Amica indicating that there was any PIP option other than these two, and she has never told an applicant that any other option was available.

9.  Farhar testified to the contrary that Hawley never informed her about any specific dollar limits on the amount of extended PIP benefits available under the policy.[3] Instead, she recalls simply being told that extended PIP offered greater coverage than

---

[3]  Farhar testified that she actually discussed extended PIP benefits in a second phone conversation subsequent to her initial contact with Amica.  Hawley indicated that the way in which the application was filled out indicated that Farhar probably had initially requested only basic PIP and then later decided to request extended PIP benefits.  Assuming that Farhar did, in fact, have a second conversation with an Amica representative concerning extended PIP and/or that she made a subsequent decision to purchase expanded PIP coverage, I find it even less credible that she was not aware of the limits on such coverage.

basic PIP and that it was advisable that she purchase extended PIP because accidents could be very expensive.  She testified that it was her understanding that extended PIP benefits would cover all medical and work loss expenses she might incur as a result of any single accident, as was the case with her health insurance.

10.  I find Hawley's testimony regarding the content of her conversation with Farhar to be credible.  Although not based on a recollection of the specific conversation with Farhar, the testimony shows that Hawley follows a prescribed and routine practice in taking applications for automobile insurance on behalf of Amica, a practice which she has followed since 1990.

11.  By contrast, I find Farhar's testimony regarding her understanding of this initial conversation with Amica not credible.  This determination is based on several factors. First, Farhar's explanation of what she understood the coverage to be has subtly evolved over time.  At her deposition, Farhar stated initially that she simply intended to purchase whatever the extra insurance was that Amica offered.  Several permutations later, Farhar's story had become that she thought she was purchasing unlimited coverage. Farhar's testimony and demeanor on the witness stand further convinces me that her purported understanding is not worthy of credence.  Finally, as explained more fully below, the written insurance application Farhar subsequently received from Amica made abundantly clear that her understanding, however conceived and formulated, was wrong.

12.  Following the initial phone conversation, Amica sent Farhar a paper application.  The plainly worded, single-page form clearly and obviously stated "**Added Personal Injury Protection Coverage** increases the total amount available to $200,000

for the above listed benefits." (Tr. Exh. 14.)  Farhar indicated that she wanted extended PIP for both medical expenses and work loss benefits, signed the form, and returned it to Amica.

13.  Amica issued a policy of insurance to Farhar effective April 30, 1996, through April 30, 1997.  The cover page of the policy states in bold type "**READ YOUR POLICY CAREFULLY**." (Tr. Exh. 1 at Amica 0001.)  Despite this advisement, Farhar admits that she only scanned the policy.

14.  Contained within the policy was an endorsement identified as PP 05 61 03 95. On the first two pages of the endorsement is a schedule of benefits.  Section II of that schedule is entitled "**ADDED PERSONAL INJURY PROTECTION BENEFITS**." Thereunder, the schedule shows that the "Maximum Limit of Liability for the Total of All Basic and Added Personal Injury Protection Benefits" is $200,000.

16.  Farhar acknowledged that, having received the policy, she never contacted Amica to inquire regarding the variance between her alleged understanding of the nature of her extended PIP coverage and the terms of the policy.  This fact too leads me to discredit her testimony regarding her belief that the policy she had purchased offered unlimited extended PIP benefits.

17.  Farhar's policy was renewed from year to year.  Prior to the expiration date of the policy, she would receive a packet of information from Amica informing her of the impending expiration of the then-current policy and the necessity of renewal if she wished to continue coverage.  For the renewal policies issued for 1997-1998 and 1998- 1999, the endorsement form referenced above in paragraph 14 included the $200,000 figure as the

5

maximum limit of liability.

18.  Because Amica is a relatively small insurer in Colorado, it relies on a company called Insurance Services Office, Inc., ("ISO") to provide forms for policies written in this state.  ISO periodically notifies Amica of relevant changes in Colorado law by means of a document called an ISO Circular.

19.  On October 19, 1998, Amica received an ISO Circular, LI-PA-1998-312, advising that the Colorado General Assembly had passed a bill effecting automobile insurance policies in the state.  The Circular notified Amica that the endorsement for policies in Colorado should be changed to delete a reference in Section V of the schedule to "resident spouse" and replace that term with the term "any family member," effective January 1, 1999.  (Tr. Exh. 5 at Amica 2621, 2628.)

20.  Nancy Bradford was the forms coordinator responsible for physically entering revisions to Amica's forms suggested by the ISO Circular.  When the change to be made was the revision of an existing form, Bradford would pull up the form from Amica's computer files, compare the existing form to the proposed revision, make the changes suggested by the ISO Circular, proofread the resulting document, and then send a copy of the proposed new form to a jurisdictional officer for approval.

21.  Bradford made the changes shown in the ISO Circular to Section V of the endorsement's schedule.  In further comparing the pre-existing Colorado endorsement to the revision proposed by the ISO Circular, Bradford noticed that ISO Circular included no dollar figure under Section II of the form showing the aggregate limit of extended PIP benefits. Bradford therefore removed the dollar figure from Amica's pre-existing Colorado

6

endorsement form.  Thus, the form she created shows a blank next to the dollar sign on

the line for "Maximum Limit of Liability for the Total of All Basic and Added Personal Injury

Protection Benefits."

22.   Bradford never saw any document indicating that the dollar figure showing the

aggregate coverage limit for extended PIP benefits in Colorado policies was to be deleted

from the endorsement.  Rather, she removed the figure because she could not deviate

from the ISO form without a jurisdictional officer's approval.  Moreover, in the policy forms

Amica uses in most states other than Colorado, the aggregate coverage limits typically are

included on the declarations page rather than on the endorsement page, as in Colorado.

23.   As was her practice, Bradford forwarded the proposed revisions to the

endorsement form to the jurisdictional officer for Colorado, Bruce Thomas.  Thomas

approved the form, which still included a blank where the dollar figure showing the

aggregate coverage limit for PIP benefits had been removed.  (Tr. Exh. 8.)

24.   On December 4, 1998, Amica sent out an Office Memorandum stating that the

new endorsement form, now designated as PP 05 61 01 99, would become effective

January 1, 1999.  The memorandum stated that the endorsement had been changed "so

that if the policyholder chooses to reject the PIP Work Loss Benefit, the exclusion now

applies to the insured and all resident relatives."  (Tr. Exh. 3 at Amica 2542.)  The memo

made no reference to any change in the aggregate limit of extended PIP coverage.

25.   From 1999 through 2003, the form underwent at least two subsequent

revisions, each of which continued to pass through the blank next to the dollar sign for the

aggregate limit on extended PIP coverage.  (*See* Tr. Exhs. 9, 10, 12; *see also* Tr. Exh. 13

(noting withdrawal of the endorsement when the Colorado No-Fault Act lapsed July 1, 2003.)  Therefore, every policy issued by Amica to Colorado insureds from 1999 through at least the middle of 2003 did not include a dollar limit on the aggregate amount of extended PIP benefits shown in the schedule portion of the endorsement.

26.  Greg Smolan, an assistant vice president for Amica and the jurisdictional officer currently responsible for Colorado, testified credibly and cogently that if Amica had intended to remove the aggregate limit of extended PIP coverage in policies issued to its Colorado insureds, it would have undertaken an extremely elaborate process, involving no less than six discrete steps and approximately seven separate departments, all of which would have been documented.  Smolan has found no such documentation anywhere in the company's files.  Moreover, Smolan testified credibly that a jurisdictional officer could not unilaterally approve a change in Amica's coverage limits.

27.  Based on these facts, I find and conclude that Amica did not intentionally remove the $200,000 figure for aggregate extended PIP coverage from its endorsement. Rather, that figure was mistakenly deleted in the process of conforming the existing form to the ISO Circular and simply not detected by the jurisdictional officer at that or any other time prior to December 30, 2004, when the omission was finally discovered and  rectified. (*See* Tr. Exh. 11.)  Given that Amica has a relatively small book of business in this state and that the policy forms its uses in other states in which it writes business do not typically show the aggregate limit of extended PIP benefits on the endorsement itself, I do not find this omission as glaring or incredible and Farhar has attempted to paint it.

28.  Concomitantly, I find that Amica did not intend to offer its Colorado insureds

8

unlimited extended PIP coverage.

29.  In February, 1999, Farhar received a renewal notice from Amica alerting her that her then-current policy would expire on April 30, 1999.  That notice included the following advisement, in bold-face type:

> **The attached Renewal Notice provides the information we will use to renew your policy.  You will also find an Information Digest which describes coverages, rate classifications, discounts and available options.  Please review this material.  If you are satisfied with your present coverage and the accuracy of your policy information, you need do nothing and your policy will be renewed without change.  If you would like to consider any changes, please call us promptly so that your policy can be renewed accordingly.**

(Tr. Exh. 19 at Amica 0120.)  Farhar testified that she understood her coverage would remain unchanged when the policy was renewed unless she affirmatively requested changes.  However, she did not request any changes to the policy at the time she renewed for the 1999-2000 policy year, and she continued to pay the same premium for extended PIP benefits.

30.  Included in the packet of materials Farhar received with her renewal notice was an Information Digest.  On the first page of this document, under the heading of "**NO-FAULT INSURANCE**" the Digest plainly states "**Added Personal Injury Protection Coverage** increases the total amount available to $200,000 on an optional basis for an additional premium."  (Tr. Exh. 19 at Amica 0128 (emphases in original).)  Farhar testified that she scanned the Information Digest when she received it, but did not recall having seen the above-quoted language.

31.  On April 12, 2000, Farhar was injured in an automobile accident.  Amica paid her extended PIP benefits related to that accident up to $200,000.

## II.  CONCLUSIONS OF LAW

1.  To the extent necessary, I approve, adopt, reiterate, and incorporate herein my foregoing findings of fact.

2.  I have jurisdiction over the parties to this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship).  Venue is proper in the District Court for the District of Colorado, under 28 U.S.C. § 1391(a).

3.  Colorado law controls my resolution of the substantive issues in this diversity case.  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Royal Maccabees Life Insurance Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005).

4.  By its complaint, Amica seeks a declaration that the maximum amount of extended PIP benefits available under Farhar's automobile insurance policy is $200,000. To recover on a declaratory judgment claim, Amica must establish that "'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1151 (10th Cir. 1974) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).  I find and conclude that his standard has been satisfied, and that , therefore, it is appropriate for this court to declare the rights and liabilities of the parties with respect to the subject contract of insurance.

10

5.  A threshold question in this case is whether Amica is entitled to reformation of the insurance contract in order to effectuate the declaratory relief it seeks.  Farhar maintains that Amica's failure to plead a cause of action for reformation is fatal to its claim in this regard.  I disagree.[4]  The Declaratory Judgment Act specifically authorizes courts to grant any and all relief that necessarily flows from a declaration of the parties' rights.  28 U.S.C. § 2202.[5]  Therefore, I find that Amica was not required to specifically plead a cause of action for reformation to be entitled to the remedy of reformation based on a declaration of its rights in the contract.  Accordingly, an amendment to conform to the evidence under Fed.R.Civ.P. 15(b) is not required.[6]

6.  Amica seeks reformation of the insurance contract on the basis of mutual mistake.  I find the allegations of the complaint sufficient under Fed.R.Civ.P. 9(b) to plead a cause of action for mistake with particularity.[7]

7.  A claim of reformation based on mutual mistake is quintessentially a claim that the contract as written does not express the true intentions of the parties.  *See Maryland Casualty Co. v. Buckeye Gas Products Co.*, 797 P.2d 11, 13 (Colo. 1990).  Where mutual mistake is pled, the parol evidence rule is inapplicable, and the court may consider extraneous documents and extrinsic evidence that bear on the question of the parties'

---

[4]  Thus, I overrule defendant's standing objection to my consideration of plaintiff's request for reformation.

[5]  The Declaratory Judgment Act is procedural rather than a substantive, and therefore it, rather than the Colorado state law counterpart, applies in this diversity case. *See Farmers Alliance Mutual Insurance Co. v. Jones*, 570 F.2d 1384, 1386 (10th Cir.), *cert. denied*, 99 S.Ct. 97 (1978).

[6]  Thus, I deny as moot plaintiff's oral motion to amend made during closing argument at trial.

[7]  Thus, I overrule defendant's standing objection to the contrary.

true intent. *Chilson v. Reed*, 389 P.2d 87, 89 (Colo. 1964); *Boyles Brothers Drilling Co. v. Orion Industries, Ltd.*, 761 P.2d 278, 281 (Colo. App. 1988); *see also In re Invenux, Inc.*, 298 B.R. 442, 447-48 (D. Colo. 2003). Thus, Farhar's citation to authority holding that the intent of the parties must be ascertained from the language of the contract itself unless it is ambiguous, *see, e.g.*, *Ad Two, Inc. v. City and County of Denver ex rel Manager of Aviation*, 9 P.3d 373, 376-77 (Colo. 2000), while accurate in other contexts, is inapposite here.[8]

8. Nevertheless, Amica's burden of proof is a heavy one. "The evidence must clearly and unequivocally show that reformation is appropriate under the circumstances." *Maryland Casualty Co.*, 797 P.2d at 13. *See also Jackson Enterprises, Inc. v. Maguire*, 355 P.2d 540, 542 (Colo. 1960).[9]

9. The doctrine of mutual mistake is not applicable unless "both parties . . . 'labor under the same erroneous conception in respect to the terms and conditions of the instrument.'" *Maryland Casualty Co.*, 797 P.2d at 13 (quoting *Smith v. Anderson*, 214 P.2d 366, 370 (Colo. 1950)); *see also Simon v. Truck Insurance Exchange*, 757 P.2d 1123, 1124 (Colo. App. 1988). In other words, a mistake on the part of one party only is insufficient to justify reformation of the contract. *Crews v. Yenter*, 352 P.2d 295, 298 (Colo. 1960); *Woodruff v. O'Dell*, 701 P.2d 112, 114 (Colo. App. 1985). However, reformation is appropriate also if there is evidence of mistake on the part of one party and

---

[8] Thus, I overrule defendant's standing objection to the contrary.

[9] However, this burden does not require more than a preponderance of the evidence. *See* §13-25-127(1), C.R.S.

fraud or inequitable conduct on the part of the other. ***Columbian National Life Insurance Co. v. Black***, 35 F.2d 571, 573 (10th Cir. 1929); ***Boyles Brothers Drilling Co.***, 761 P.2d at 281.

10.   Farhar maintains that any mistake in the 1999-2000 policy regarding a cap on the aggregate limit of PIP coverage was Amica's alone.  She contends that she always believed the policy provided benefits unlimited in time and amount for all medical expenses and work loss associated with any single accident.  As noted above, I find this testimony incredible.

11.   Moreover, if such was Farhar's true belief at the time she applied for the policy, that belief quickly would have been dispelled by the information Farhar received in her phone conversation with Hawley, as well as by the patent language of both the application she signed and the policy itself.  Moreover, Farhar could not reasonably have expected to obtain a policy that was contrary to any standardized option Amica offered:

> Due to this standardized nature of insurance policies, the intent of an insured regarding the specific terms of a policy can be inferred from the fact of his application for a particular type of policy.  Surely the plaintiff in the instant case, . . . expected the correct figures to be supplied in the policy as issued.  He would not have intended the policy to vary from standard terms in a way detrimental to him, nor can he reasonably expect to be given advantages or benefits for which he has neither bargained nor paid.

***Hanes v. Roosevelt National Life Insurance Co. of America***, 452 N.E.2d 357, 363 (Ill. App. 1983) (citation omitted); ***see also Home Life Insurance Co. v. McCarns***, 16 A.2d 587, 589-90 (Del.  Ch. 1940) (insured who applied for standard life insurance policy "never expressly bargained for, nor had the right to expect" a policy "that in any way differed from

13

the usual form of policies of that nature issued by the [insurer]" and "regardless of whether, prior to that time, she actually knew what [the cash surrender value of the policy] should be, that is precisely the kind of policy she bargained for, and what the annual premiums paid for").

12.  Nor did Amica's inadvertent, erroneous, and unintentional removal of the $200,000 figure from the face of the 1999-2000 endorsement, form PP 05 61 01 99, operate to retroactively validate Farhar's mistaken belief in the unlimited scope of her extended PIP coverage.  Indeed, Farhar acknowledged that she knew the policy would be renewed with the same coverages previously in effect unless she specifically requested changes.  She requested no such changes, and paid the same premium for extended PIP in 1999 as she had in the three prior years.  Therefore, I find and conclude that her intent in renewing the policy 1999 was to continue her then-existing coverage, which included the $200,000 cap.

13.  Moreover, this intent is consistent with the legal principle that "'[i]t is reasonable for the insured to assume without reading that a 'renewal' policy is just like the policy that is expiring.'" *American Casualty Co. v. Glaskin*, 805 F.Supp. 866, 872 (D. Colo. 1992) (quoting 3 **CORBIN ON CONTRACTS**, § 614 n.21 (1960)).[10]  It is also consistent with the presumption that, absent evidence to the contrary, "the parties intended to adopt in the renewal policy the terms, conditions and coverage of the expiring policies." *Pearl*

---

[10]  Although Farhar argues that this presumption applies only where the insurer has reduced or deleted coverage, I find no such necessary limitation either in the case law she cites or elsewhere. Nevertheless, even if Farhar is correct, it was clearly her specific intent to continue the policy unchanged from previous years.

*Assurance Co. v. School District No. 1 in San Miguel County, Colorado*, 212 F.2d 778, 782 (10th Cir. 1954).

14.   Therefore, I find and conclude that Amica and Farhar both were laboring under the mistaken belief that the renewal policy issued for the 1999-2000 policy year contained the same aggregate cap of $200,000 on extended PIP benefits as had been offered – and accepted – in previous years.

15.   Alternatively, I find that even if Farhar may not have been aware of the actual dollar figure of her extended PIP benefits, it is inequitable now for her to seek to turn Amica's clerical error into a claim for unlimited PIP benefits.   "[K]nowledge by one party of the other's mistake regarding the expression of the contract is equivalent to mutual mistake."   *Columbian National Life Insurance Co.*, 35 F.2d at 574 (citation and internal quotation marks omitted).   I agree with Amica that the *Columbian National Life Insurance Co.* decision, although rendered more than 75 years ago, makes an eloquent case for why the contract in this matter must be reformed:

> It is true the defendant on the stand and in his letters denies any mistake on his part.  But his actions speak louder than his words.  He applied for an ordinary life policy; without any quibble, and in response to his application, he received a policy that manifestly was in error.  He only paid for an ordinary life policy.  When he received the policy he either did or did not notice the error.  If he did not notice it, the mistake was mutual. If he did notice it and said nothing, he was guilty of such inequitable conduct as to amount to fraud.  A man presents a check for $100 to a bank teller; he gets two $100 bills.  No matter how loudly he asserts the lack of mistake on his part, the fact still remains that he was either mistaken or was trying to benefit by the teller's mistake.

*Id.*[11]

16.  Accordingly, I conclude that Amica is entitled to a declaration that the 1999-2000 automobile insurance policy issued to Farhar included a cap on the aggregate limit of extended PIP benefits of $200,000.  Therefore, the policy should be reformed to reflect the parties' true intentions in that regard.

### III.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That plaintiff Amica Mutual Insurance Company's claim for declaratory judgment is **RESOLVED** by the court's construction that the 1999-2000 policy of automobile insurance issued by Amica to Farhar includes an aggregate limit on the amount of extended PIP benefits available under the policy of $200,000;

2.  That no later than close of business **February 27, 2006**, Amica **SHALL FILE** an appropriate motion to dismiss Farhar's counterclaims, all of which are dependant on findings of fact and conclusions of law contrary to those entered in this order.

Dated February 17, 2006, at Denver, Colorado.

                                                **BY THE COURT:**

                                                **s/ Robert E. Blackburn**
                                                **Robert E. Blackburn**
                                                **United States District Judge**

---

[11]  Farhar's attempts to distinguish this case on its facts and otherwise are unconvincing.

16